UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| GEORGE R. PARKER, ) | CASE NO. 1:13CV2551 |
| ) | |
| Plaintiff, ) | MAGISTRATE JUDGE GEORGE J. |
| ) | LIMBERT |
| v. ) | |
| ) | |
| CAROLYN W. COLVIN[1], ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

George R. Parker ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court REVERSES the ALJ's decision and REMANDS this case to the ALJ for further proper articulation and analysis under the treating physician rule and to address whether Plaintiff meets or equals Listing 1.04:

## I. PROCEDURAL AND FACTUAL HISTORY

On May 18, 2010, Plaintiff applied for SSI and DIB, alleging disability beginning September 30, 2007. ECF Dkt. #11 ("Tr.") at 143-154.[2] Plaintiff met the insured status requirements of the Social Security Act through September 30, 2011 ("DLI"). Tr. at 17. The SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 100-115. Plaintiff requested an administrative hearing, which was held *via* video-teleconference on March 22, 2012. Tr. at 30-61. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Jill Radkey, a vocational expert ("V.E."). On July 13, 2012, the ALJ issued a Decision denying

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited document and the page number assigned to cited pleading by the ECF system, which can be found in the search box at the top of the page on the ECF toolbar.

benefits. Tr. at 18-29. Plaintiff filed a request for review, which the Appeals Council denied on September 26, 2013. Tr. at 1-6.

On November 18, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On April 16, 2014, with leave of the Court, Plaintiff filed a brief on the merits. ECF Dkt. #17. On June 30, 2014, with leave of the Court, Defendant filed a brief on the merits. ECF Dkt. #20. A reply brief was filed on July 14, 2014. ECF Dkt. #21.

**II**.     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-four years of age on the alleged onset date and forty-nine years of age at the hearing, suffered from lumbar degenerative arthritis, scoliosis in the lumbar and thoracic spine, a mood disorder, not otherwise specified (NOS), and poly-substance abuse, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 15. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 15-17.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work, as defined in 20 C.F.R. §§404.1567(c) and 416.967(c), subject to no public contact work or work in coordination with others. Tr. at 17. Plaintiff must work alone and his work must be routine, and stay the same day-to-day. Tr. at 17. Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to fifty pounds and requires almost constant walking or standing.

The ALJ ultimately concluded that, although Plaintiff could not perform his past work as a furniture mover or driver, he could perform the representative occupations of janitor, routing clerk, and cleaner. Tr. at 22-23. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits. Tr. at 23.

**III.     STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**IV.     STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ violated the treating physician's rule when he did not give controlling weight to the opinion of two of Plaintiff's physicians. Next, Plaintiff contends that the ALJ failed to undertake a proper analysis at step three of the sequential analysis where he concluded that Plaintiff did not meet or equal Listing 1.04.

### A. Medical evidence

Plaintiff has been incarcerated a good part of his adult life and he has a sporadic work history.[3] He filed his disability applications just a few days after being released from prison in May of 2010. Tr. at 18. Plaintiff, however, alleged that he stopped working and became disabled on September 30, 2007 because the company that employed him was shut down and his back was "bothering [him]." Tr. at 181.

Plaintiff has a twelfth grade education and past relevant work as a furniture mover and driver, classified by the VE as semi-skilled and between light and heavy, according to Plaintiff's description of the work. Tr. at 52. Plaintiff reported having a long history of low back pain since he was a teenager due to scoliosis of the spine. Tr. at 289.

However, Plaintiff's inmate health problem list, dated December 28, 2007, and his February 6, 2008 transfer documents identified arthritis as his only impairment. Tr. at 255, 258. At that time,

---

[3]Relevant to this appeal, Plaintiff was incarcerated from December of 2007 through December of 2008, and again from August of 2009 through of May 2010. Tr. at 190, 231.

-4-

Plaintiff did not use any assistive devices, such as a cane. Tr. at 254, 258, 316. He was medically cleared to work as a food service worker. Tr. at 263.

While in prison from December of 2007 to December of 2008, Plaintiff intermittently requested medical care for low back pain, and specifically requested standing restrictions and a low bunk assignment. Tr. at 241, 243, 244, 245, 268, 281, 289-91. At a July 15, 2008 examination, Plaintiff walked normally, moved easily and got on the examination table easily. Tr. at 289. Although he had some left paraspinal area deformity, he retained a full range of motion in his spine. Tr. at 289. His reflexes were normal. Tr. at 289. The attending physician specifically noted that Plaintiff's symptoms were "not substantiated by his examination." Tr. at 289. Back exercises were demonstrated and he was prescribed Ibuprofen for thirty days. Tr. at 289. He was eventually given a short-term restriction of low bunk for one month in November 2008. Tr. at 317. However, he was denied any lifting, standing, or sitting restrictions. Tr. at 317.

A December 18, 2007 x-ray of Plaintiff's lumbar spine confirmed moderate scoliosis and also that Plaintiff's facet joints were well maintained and that no definite disc space narrowing was appreciated. Tr. at 296. Similarly, a July 31, 2008 x-ray of Plaintiff's lumbar spine showed presence of a moderate levoscoliosis in the upper lumbar area. Tr. at 294. Plaintiff had "only very minimal" degenerative changes. Tr. at 294. His disc spaces were relatively well maintained. Tr. at 294.

During Plaintiff's second prison term during the relevant period of review, August of 2009 to May of 2010, Plaintiff's inmate health problem list increased to included back pain secondary to degenerative disc disease, scoliosis and sciatica, and history of polysubstance abuse. Tr. at 345.

A November 3, 2009 x-ray of Plaintiff's lumbar spine showed scoliosis and degenerative changes at L3-4. Tr. at 383, 420. A March 3, 2010 electromyography ("EMG") and nerve conduction study was negative for radiculopathy . Tr. at 376. A March 12, 2010 arterial Doppler was negative for lower extremity occlusion . Tr. at 369. A March 29, 2010 magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine revealed that Plaintiff's spinal canal was "narrowed to 9 mm in AP diameter with loss of the CSF signal intensity around the nerve roots," but the overall impression was that he had only mild diffuse multilevel degenerative disc disease with mild bulging of the disc at L3-4 in the right paracentral area with mild stenosis of the spinal canal. Tr. at 339, 365, 416.

Despite the mild diagnostic test results, Plaintiff claimed to experience worsening lower back and lower extremity discomfort that rated nine on a scale of one to ten. He used a cane. Tr. at 387-400. Plaintiff was given short-term restrictions on a bottom bunk, low range from December 2009 and prolonged standing. Tr. at 348, 356, 441-32, 439, 442, 467. However, he did not receive any work program limitations. Tr. at 352.

An April 26, 2010 examination revealed that, although he was walking with a cane, Plaintiff had full movement and range of motion to his extremities, good posture, strong muscle strength, and movement to both upper and lower extremities times two. Tr. at 385. Upon Plaintiff's release on May 7, 2010, his only medication was Flexeril but he had a restriction of no standing . Tr. at 346.

Plaintiff had no psychiatric treatment and no signs or symptoms of psychological decompensation while in prison. Tr. at 254, 338, 491. Plaintiff inconsistently acknowledged having a history of polysubstance abuse (alcohol, cannabis, and cocaine) – first, completely denying any use, Tr. at 312, 479, but later admitting in February of 2008, and in December of 2009 that he abused illicit substances. Tr. at 311, 423, 475, 495. A December 26, 2009 mental status examination revealed full affect, good concentration, good mood, a kempt appearance, intact memory and normal speech. Tr. at 498.

In May of 2010, after being released from prison, he began physical therapy for lower back pain. Tr. at 518-524. On June 11, 2010, Plaintiff had an initial evaluation with neurologist Darshan Mahajan, M.D., who confirmed that Plaintiff's MRI showed only mildly diffuse multi-level degenerative disc disease with mild bulging at L3-4 in the right paracentral area with mild stenosis of the spinal canal. Tr. at 528. Dr. Mahajan confirmed that Plaintiff's May 2009 left hip x-ray was normal and unremarkable. Tr. at 528.

On examination, Plaintiff had normal muscle tone and normal muscle mass with normal power in all muscle groups. Tr. at 530. Plaintiff's gait was normal and he maintained his Romberg position very well. Tr. at 530. He had normal sensation. Tr. at 530. Dr. Mahajan diagnosed scoliosis, lumbago and degeneration of intervertebral disc. Tr. at 531. Dr. Mahajan administered an EMG, which he interpreted as showing changes of mild to moderate bilateral L5 radiculopathy being worse on the left side; a mild change of bilateral S1 radiculopathy. Tr. at 535, 568.

Plaintiff was in a car accident in September of 2010, after which he began treatment at Northcoast Pain Management Specialists. Tr. at 735-749, 607-615. At his initial visit on September 22, 2010, Plaintiff described ongoing back, hip, and shoulder pain, muscle spasms, and numbness in the leg and food exacerbated by the car accident. Tr. at 748. At follow-up appointments in September and October, Plaintiff reported that his pain had been slightly reduced with Vicodin. Tr. at 746, 744. He reported pain at a level of seven on a scale of one to ten with Vicodin. Tr. at 744.

At an October 20, 2010 appointment, Plaintiff reported that he had experienced "some" pain in the previous few days but that the injections had alleviated his pain. Tr. at 743. In fact, Plaintiff's physician noted that Plaintiff derived a "significant" benefit from injections and that Plaintiff's condition was improving. Tr. at 743. On October 27, 2010, Plaintiff reported improvement, but informed his physician that he "helped a friend move," and, as a result, his pain, which was at a level four or five on a scale of one to ten, was at seven. Tr. at 742. Obviously, Plaintiff's efforts to help his friend move are completely at odds with his reports of debilitating pain.

On November 3, 2010, Plaintiff reported that the injections provided immediate relief, but that the pain relief subsided after the first few days after the injection. Tr. at 741. Plaintiff was prescribed Vicodin. On November 10, 2010, Plaintiff reported that he was very busy one day and that he experienced no pain, but the following day he was in great pain. Tr. at 740. He also reported that he ran out of Vicodin and that his most recent injection did not provide as much relief as injections in the past. Tr. at 740. At his November 24, 2010 appointment, Plaintiff reported that, between his prescription pain medication and the injections, he could "live tolerable." Tr. at 739. In December of 2010, Plaintiff reported that the injections and his Loratab prescription had been keeping his pain under control. Tr. at 738. His pain level was five on a scale of one to ten. Tr. at 738.

On December 22, 2010, Plaintiff complained of increasing back and shoulder pain. Tr. at 614. A December 14, 2010 x-ray showed some disc space narrowing at the L3-4 and L4-5 levels. Tr. at 655. An x-ray of the cervical spine showed narrowing at the interspace at C5-6. Tr. at 656. X-ray of thoracic spine showed that the disc spaces were well preserved. Tr. at 657.

On January 26, 2011, Kathleen Talbot, M.D., Plaintiff's treating physician at Northcoast from September of 2010 to March of 2011, completed a medical statement form on January 26, 2011, indicating that Plaintiff had a neuro-anatomic distribution of pain, limitation of motion of the spine, and a need to change position more than once every two hours. Tr. at 605. Dr. Talbot observed that Plaintiff could not stand for more than ten minutes at one time, or sit for more than ten minutes at one time, but that he could sit for eight hours total during an eight-hour workday and stand for two hours total during an eight-hour workday. Tr. at 605. She opined that he must take five minute breaks, either lying down or sitting quietly, every fifteen minutes during an eight-hour workday. Dr. Talbot wrote that Plaintiff did not have motor loss (muscle weakness or atrophy with associated muscle weakness), sensory or reflex loss, a positive straight leg-raising test, or the inability to ambulate effectively. Tr. at 605. She opined that Plaintiff was limited to a range of less than sedentary work. Tr. at 605-06.

On January 25, 2011, Plaintiff began treatment at the Nord Center.  Plaintiff was homeless and unemployed, anxious and depressed, and reported that "everything is messed up." Tr. at 720. Plaintiff was estranged from his wife and brother at the time.  Plaintiff reported that he had been depressed for most of his life and when he was depressed he did not like people.  Tr. at 724.  He further reported problems with focus and memory during the past six or seven years, as well as impulsiveness, which has been a life long problem.  Plaintiff was diagnosed with a mood disorder, not otherwise specified, and an impulse control disorder, not otherwise specified, as well as a substance abuse problem, and anti-social personality disorder, with rule-out substance abuse mood disorder and post-traumatic stress disorder. A mental status exam was conducted and an individual service plan ("ISP") was put into place. Tr. at 726.

Plaintiff returned on February 2, 2011 for his first individual counseling session with John Vesel, PCC. Tr. at 717.  Plaintiff reported frustration and the desire to be normal. The ISP was not initiated because the counselor wanted to give Plaintiff the opportunity to express himself before implementing the plan. The counselor noted some progress. On February 23, 2011, the ISP was initiated. The goals and objectives were learning developing and utilizing coping skills to manage his problems. The plan provided for quarterly counseling sessions.  Tr. at 714.

On March 9, 2011, Plaintiff reported frustration with various aspects of his life, and a general feeling being overwhelmed. Tr. at 710. He further reported fear that if his anger and frustration is pent up, he will explode. Mr. Vesel discussed guilt and forgiveness, and the importance of sharing feelings in a healthy manner. Plaintiff returned to Nord on March 25, 2011, and continued to express frustration and mistrust of others. He and Mr. Vesel agreed that a psychiatric evaluation was a good idea and that medication may improve his mood. Tr. at 708.

On April 8, 2011, Plaintiff underwent a psychiatric evaluation with Dominic Gomes, M.D. Tr. at 702-707. Plaintiff reported an abusive childhood as well as abusive relationships while he was incarcerated. Tr. at 702. Dr. Gomes assigned a Global Assessment of Functioning ("GAF") score of sixty-one, indicating mild symptoms. Dr. Gomes prescribed Depkote, Cymbalta, and Trazadone. Tr. at 707. At his April 15, 2011 counseling session, Plaintiff expressed distrust of Dr. Gomes. However, Plaintiff stated that he believed that Depakote was helping him, and he agreed to begin taking Trazadone. His counselor noted good progress.

On May 19, 2011, Plaintiff reported feeling less angry while on medication, but reported that he was still depressed and that he did not believe he would receive Medicaid. He expressed distrust of the government, and believed that the government was intentionally making his life more difficult. Mr. Vesel noted some progress. On May 26, 2011, according to a Pharm Management Progress Note, Dr. Gomes noted that Plaintiff's Trazadone prescription had run out, and that he remained depressed and paranoid. Plaintiff reported that his Medicaid application had been denied and that the government was "after [him]." Tr. at 696. Dr. Gomes reported no progress, and assigned a GAF score of thirty, indicating some impairment in reality testing or communication.

Dr. Gomes and case manager Ed Krause, LSW, completed a medical source statement, on August 25, 2011, advising that Plaintiff was paranoid and unable to complete simple directions. Tr. at 731-731. They noted that Plaintiff had marked limitations in six of the seven work-related factors, including his ability to perform work activities at a reasonable pace, keep a regular work schedule and maintain punctual attendance, interact appropriately with others, withstand stress and pressure of routine simple unskilled work, and make judgments that are commensurate with the functions of unskilled work . Tr. at 731. Dr. Gomes and Mr. Krause reported only a moderate limitation in

-9-

Plaintiff's ability to maintain attention and concentrate for two hour periods of time. It is important to note that Mr. Vesel, not Mr. Krause, was Plaintiff's counselor.

In September and October of 2011, Norman Flora, M.D., diagnosed lumbago secondary to lumbar degenerative disc changes and scoliosis. Tr. at 752. Plaintiff claimed that he was suffering intense pain, nine on a scale of one to ten. Dr. Flora refused to prescribed narcotic pain medication based upon Plaintiff's history of drug abuse, but prescribed a muscle relaxant and Tramadol instead. Tr. at 753. A drug test given by Dr. Flora in September revealed illegal drug use. At the October appointment, Plaintiff admitted that a drug test would be positive for marijuana. Tr. at 751. Plaintiff visited the emergency room in November of 2001, describing a pain level of ten on a scale of one to ten, but testing revealed only lumbar degenerative changes and scoliosis. Tr. at 770-775.

In February of 2012, Plaintiff treated with Evan Rae, M.D., a primary care physician, who evaluated Plaintiff for a pain management referral. Plaintiff described pain at a level of ten on a scale of one to ten, however, Dr. Ray acknowledged that an x-ray performed on September 30, 2011 revealed scoliosis with mild degenerative changes. Tr. at 840. In March of 2012, Plaintiff was referred to pain management with Sameh Yonan, M.D., who administered a lumbar epidural. Tr. at 859. Dr. Yonan prescribed Ultram ER, Etodolac, Zanaflex, and Neurontin. Tr. at 859.

### B. State Agency Assessments

On July 12, 2010, state physician consultant Walter Holbrook, M.D., opined that Plaintiff could perform medium work as he noted that Plaintiff's stated limitations are severe and not consistent with the objective medical findings, such as the March 2010 MRI . Tr. at 62-69, 70-77. At the next visit on July 28, 2010, Plaintiff reported feeling better after physical therapy and traction, Tr. at 540, but reported that his alleged back pain had not improved. Tr. at 540. On examination, Plaintiff's strength was well maintained, his balance good and he walked well. Tr. at 541. On November 8, 2010, state agency physician consultant, W. Jerry McCloud, M.D., reviewed the evidence of record and concluded that Plaintiff's alleged limitations were not fully credible, and were inconsistent with the objective medical findings. Tr. at 80-88, 89-97.

### C. Hearing testimony

At the hearing, Plaintiff testified that he cannot stand for more than a few minutes, he cannot walk steps, and he cannot lift anything.. He further testified that he has experienced pain in his right hand ever since it was broken. He suffers pain in his entire body. Tr. at 36. He also experiences cramping in his joints if he sits for more than a couple of minutes, and has to recline to alleviate the pain. Tr. at 37, 48.

His pain level is eight on a scale of one to ten everyday. Tr. at 38. When his pain level rises to nine or ten out of ten, he goes to the emergency room. He treated with a pain management specialist, Tr. at 39, and at the time of the hearing, he was prescribed Tizanidine, Etodolac, Gabapentin, Deparkote, Zyprexa, Cymbalta, Tramadol, and Celebrex. Tr. at 44. Plaintiff no longer used a cane because the use of the cane puts more pressure on his nerves. Tr. at 42.

Plaintiff testified that he is easily confused and stays by himself because he "get[s] into trouble" when he is around people. Tr. at 39, 49. He lives alone and treats at the Nord Center with Dr. Gomes once a month, and with his case worker once every two weeks. Tr. at 39-40. He occasionally visits his wife and brother, or they visit him. They make sure he is eating, taking his medication, and attending his medical appointments. Tr .at 40.

Plaintiff testified that he stopped abusing marijuana and alcohol a few months prior to the hearing due to his concerns about drug interaction. Tr. at 41. He spends most days watching television and playing with his brother's dog. Tr. at 43. He does not trust people and he admits that he is paranoid. Tr. at 43-44. Plaintiff expressed fear that he will engage in an altercation with a stranger and have to return to jail. Tr. at 43.

### D. The ALJ's Decision

Plaintiff contends that the ALJ erred in giving little weight to the opinions of Drs. Talbot and Gomes, both of whom are treating physicians. The ALJ explained that he gave minimal weight to Dr. Talbot's assessment because she did not indicate the duration of Plaintiff's treatment or frequency of his appointments. The ALJ also found that Dr. Talbot's opinion was at material odds with the diagnostic record. He wrote that both Dr. Talbot and Dr. Yonan diagnosed disc herniation, but that the diagnosis was unsubstantiated. Finally, the ALJ found that Dr. Talbot's assessment was

inconsistent with the longitudinal evidence. Instead, the ALJ gave great weight to the opinions of the state agency physicians because they were able to review the opinions of other physicians in the record, and were supported by the evidence of record, Plaintiff's lack of routine treatment, and his lack of need for an assistive device. Tr. at 22.

Similarly, the ALJ explained that he gave little weight to the assessment provided by Dr. Gomes because there was no longitudinal treatment to support his opinion. The ALJ wrote that he could not determine the length or frequency of Plaintiff's treatment with Dr. Gomes. The ALJ also found that Dr. Gomes' opinion was at odds with other medical evidence in the record. In support of this conclusion, the ALJ cited prison records where Plaintiff denied any mental problems. The ALJ also observed that Plaintiff's mental health treatment "technically did not last even twelve months and previously had not surfaced as a source of restriction." Tr. at 22.

Next, Plaintiff also contends that the ALJ failed to provide sufficient analysis at step three of the analysis regarding Plaintiff's back problems. With respect to Plaintiff's physical impairments, the ALJ wrote:

> [Plaintiff's impairments, either singly or in combination, do not meet or medically equal a listed section. Specifically, [Plaintiff's] back disorders do not meet or medically equal section 1.04 because they do not result in the compromise of a nerve root or the spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbarspinal stenosis, resulting in an inability to ambulate effectively.

Tr. at 16.

Finally, Plaintiff asserts that the ALJ ignored the medical evidence in the record and focused instead on Plaintiff's criminal history. For instance, in reaching the conclusion that Plaintiff was not disabled, the ALJ wrote:

> Beyond the foregoing, [Plaintiff] acknowledges a life-long criminal history that included substance offenses, assault on a police officer, manslaughter, kidnapping, robbery, trafficking, emotional and verbal abuse of others, oppositional behaviors and evidence tampering, which would imply that reasons other than disability explain a very sporadic work history.

Tr. at 21.

### E. **Treating Physician Rule**

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the

-12-

opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The

Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Here, the ALJ ignored evidence in the record that established that both Dr. Talbot and Dr. Gomes were treating physicians. The ALJ concluded that, because both physicians had failed to disclose the duration and frequency of their treatment in their respective assessments, he could not determine whether they were treating physicians to be accorded deference. In fact, that information was discernable from the record. The ALJ's summary conclusion regarding the nature of Plaintiff's treatment with Drs. Talbot and Gomes suggests that he did not thoroughly review the medical evidence. Of equal concern, the ALJ wrote that he gave great weight to the opinions of the agency physicians with respect to Plaintiff's physical impairments, for the reason that they were able to review the medical evidence of record. In fact, the opinions of the agency physicians pre-date both the medical records from Northcoast, and, as a consequence, Dr. Talbot's assessment. With respect to Dr. Gomes' assessment, there were no agency mental assessments in the record to credit. Finally, the ALJ concluded that the opinions of Drs. Talbot and Gomes were not supported by the record. However, as previously stated, the ALJ gave short shrift to the medical records from Northcoast and

-14-

Nord[4], and, therefore, it is not clear from the record whether the ALJ considered those records, particularly in light of his summary dismissal of the assessments provided by Drs. Talbot and Gomes.

The Sixth Circuit recognized in *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541(6th Cir.2004) that, in some circumstances, a violation of the treating physician rule might be "harmless error" where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Id.* at 547. Having reviewed the medical records of Drs. Talbot and Gomes, the Court is not convinced that their opinions are deficient to the degree that the ALJ could not possibly credit them. Accordingly, because the ALJ has failed to properly apply the treating physician rule, this matter must be remanded in order for the ALJ to reconsider the opinions of Drs. Talbot and Gomes.

### F. Listing 1.04

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir.2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii) ). An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment. *Id.* at 415; *Hunter v. Astrue*, No. 1:09CV2790, 2011 WL 6440762, at *3 (N.D.Ohio Dec.20, 2011); *May v. Astrue*, No. 4:10CV1533, 2011 WL 3490186, at *8-9 (N.D.Ohio June 1, 2011). Nevertheless, it is the claimant's burden to show that he meets or medically equals an impairment in the Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir.1987) (*per curiam*).

---

[4]For instance, the ALJ summarized Plaintiff's treatment notes from Northcoast as follows:

> Beginning in September 2010, after his wife drove into the front of the car ahead of her, [Plaintiff] saw Northcoast pain management specialists briefly. he was to pursue physical therapy, but did not do so. [Plaintiff] remained with this source intermittently until December 2010, which would imply that follow-through remained inconsistent and that [Plaintiff] simply pursued medical attention until a source no longer prescribed pain medication.

Tr. at 19.

The ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the Listing, specifically Listing 1.04, captioned "Disorders of the spine," which reads, in its entirety:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
>> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>>
>> OR
>>
>> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>>
>> or
>>
>> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

The regulations "do[ ] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue," and there is no heightened articulation standard at step three when the ALJ's findings are supported by substantial evidence. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir.2006).

In his brief, Plaintiff cites evidence taken from diagnostic tests and the medical records at Northcoast to establish that he meets or equals Listing 1.04. Plaintiff writes:

> Evidence of a compromised nerve root is an MRI study of March 29, 2010, showing the "spinal canal is narrowed to 9 mm in AP diameter with loss of the CSF signal intensity around the nerve roots," Tr. at 339, and an EMG of July 28, 2010, showing "mild-to-moderate" bilateral L5 radiculopathy, worse on the left side, and mild

-16-

> bilateral S1 radiculopathy. Tr. at 535. Pain management physician Kathleen Talbot, M.D., diagnosed HNP with radiculopathy.
>
> Evidence of neuro-anatomic distribution of pain is Dr. Talbot's statement at Tr. 605, cf. 610,611. Evidence of limitation of motion of the spine is Dr. Talbot's statement at 605, cf. Tr. 610 (decreased ROM L/S), 399. Evidence of motor loss with weakness is at Tr. 399 (poor muscle strength on left), 521, 614 (12/22/2010 – "weakness left leg"). Evidence of sensory loss (tingling and numbness) is at Tr. 241, 510, 535 (EMG). Evidence of positive straight-leg raising test is at Tr. 510, 690, 658, 662.

ECF Dkt. #17 at p. 11.

Although the ALJ specifically rejected Dr. Talbot's finding of a herniated disc, he failed to address any of the evidence identified in Plaintiff's brief. Having previously concluded that the ALJ discounted Dr. Talbot's assessment and the medical records from Northcoast, the ALJ is instructed on remand to consider this evidence as it relates to Listing 1.04.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision is REVERSED and this matter is REMANDED to the ALJ for further proper articulation and analysis under the treating physician rule and to address whether Plaintiff meets or equals Listing 1.04.

DATE: February 18, 2015

                                      */s/George J. Limbert*
                                      GEORGE J. LIMBERT
                                      UNITED STATES MAGISTRATE JUDGE